May it please the court, my name is Phillip Buffington and I'm here on behalf of OnPath Fed Crdt Un, or formerly known as ASI Fed Crdt Un. OnPath started serving low and moderate income members and has been doing so since 1961. Today it has over 64,000 members and about two decades ago, in the aftermath of Katrina, in an attempt to serve those members better, they applied for and received certification from the CDFI. Over a period of time, they received approximately $12 million in funds from the CDFI institution. There's been no finding of misuse or wrongdoing with respect to any of the funds awarded, but now the CDFI fund is demanding repayment of those funds because of immaterial errors in the application. There was never a finding of eligibility and there was never a finding that the errors in the application had a material impact on the application itself or arose to the level of a material default. We believe that the decision of CDFI is clearly arbitrary and capricious in this matter and would respectfully present on appeal two issues. The agency decision was not arbitrary and capricious as the district court ruled. We think that should be appealed. And the second error on appeal is the district court not allowing the supplementation of the administrative record. Let me be clear about those two because they seem to be somewhat inconsistent. We believe the district court erred in the agency decision being not arbitrary and capricious. We believe the administrative record clearly shows that the agency clearly went beyond its capacity and that this decision is arbitrary and capricious. We don't necessarily think that supplementation of the record will have any impact on the fact that the decision itself was arbitrary and capricious, but we do believe that supplementing the record would have an impact on whether the court could determine if all of the information that needed to be considered was considered and so therefore you could find that there was an eligible institution in this instance and that there was no material default based on the OIG audit. Our request for relief here is fairly simple. We're asking you to reverse and remand and find that the repayment demand is arbitrary and capricious. And if you so find, sending it back to the agency for those determinations as to whether or not there was a default. The critical part of our case through all of the information is whether the errors found by OIG or a material misrepresentation justifying a default under the application with the CDFI and if there was enough justification for the CDFI to determine that the default was a material default and therefore could reclaim the money. The agency never analyzed the impact of the errors. They only made some assumptions throughout the record. The CDFI's fund determination. Is there a requirement of materiality? Yes, Your Honor. In the default provision of the agreement itself, it says that inaccuracies can be deemed to default if they are material. That's the grant itself. That's the whole language that the CDFI is using here. Nobody ever made a determination of eligibility. What happened was the OIG found some errors. They claimed that was a submission of invalid information and I can get into all of that and describe that if you want me to, but what we did then is we moved from OIG to the CDFI and the CDFI jumped a whole step in this process. They said relying on the OIG audit, we have found that there is a default and so therefore OnPath should be required to repay all of the funds they received. Did you ask to try to get these experts and also Mr. Richards and Mr. Redigan, did you try to put those into the administrative record? Was there a procedure in the administrative process whereby you could have introduced all of that information? Your Honor, they really are already in there. There are three Mr. Redigan gave a report in 2019 basically making a determination that the target markets were such that they would be eligible for certification. Didn't go into a full analysis at that time. It was a short five page report. His second report did address the fact that he looked at information and made a determination that in fact OnPath was eligible. So that's in the administrative record. I'm trying to see if you were treated fairly in the administrative process by getting all of your information there because you're trying to supplement now and so I'm just trying to make sure that you were treated fairly. So you had all of that already in the administrative process. The first two reports are the administrative record. The third report of Mr. Redigan is a detailed analysis of the information that was provided in the administrative record and really only repeats his findings that he found in the second report and really more of an accurate review or a thorough review of the administrative record information. And so we did have that opportunity. But Your Honor, I wish I could stand here and cite case law after case law for y'all as to where this was applicable and how this applied to us. But we can't find anywhere where an agency or the CDFI agency has sought to recoup money from one of its certified institutions 15 years after the fact based on invalid information that it allegedly submitted at the time. And we don't even believe that the record truly reflects that that information was inaccurate, excuse me, invalid. It may have been inaccurate in the classifications of how it was done, but that was the newness of this system. The CDFI and this institution, ONPAD, really were not at the level of being able to administer this program. One of the problems that we had was the fact that when we were trying to go through, and this is all in the record, all the information we were trying to go through to submit our application, the agency itself pushed us away from the determination that we were trying to go to at first because they were incapable of processing the number of members we had. And this was inputting data into a system. Every time we did it, the system shut down. And quite frankly, throughout the process, it never really takes into consideration the role that CDFI played in helping ONPAD file this application, make determinations, submit information, and then receive back from CDFI a certification letter saying that they were certified. We get into some issues about whether or not our description of a target market is long enough and broad enough and whether or not it describes in enough detail. And I know you've seen in the pleadings where essentially the question that's asked itself is like a two-sentence question. It gives one example of how you can justify income classifications by saying, if you have a tax return, then you can say that as part of your process to base whether or not your member is, in fact, low income. Well, we ended up doing an income analysis as opposed to a target market analysis because of the agency's inability to process our application. We also... Your position that you did this with their full knowledge and there was no indication at the time you were doing it that it was wrong. That's correct, Your Honor. You thought you were doing it the right way. There was give and take there. I cannot stand here and tell you that the institution I represent was sophisticated and able to process all of this information. They were not. They were a small credit union in Louisiana. And quite frankly, if you look at their marketplace, there is no way that you could make a determination that they didn't serve low income neighborhoods. I think everybody agreed with that. Where the hangup was, and we kept going back and forth on how to draw that and how to do all of that in the application, but the real problem when we get after the fact and there is somebody reports on path to the CDFI about the possibility of misusing funds. And I know you want to ask me, and that's why I raised the question. There's no determination anywhere that we misused the funds, they were misapplied, or the funds were implemented in the communities they should have to serve the purpose they should have served. And quite frankly, this isn't in the record. You'll have to forgive me. I'm really passionate about this. If this money has to be repaid by this institution, it will have a significant negative impact on the marketplace it serves. And what I can do is refer you back to the record where the CDFI itself in conversations with the OIG said, we are not leaning in the direction, and I'm paraphrasing, of requiring this institution to repay this money. It's unprecedented. We can't find any case where the CDFI or the OIG, and we have done a thorough search, we cannot find any case where an institution is having to repay money paid under these grant programs because of a determination ten years after the fact that the information submitted was invalid, but that information was also submitted in conjunction with working with the CDFI on preparing the information that needs to be submitted. And they cite a couple of things that they really have a In fact, in our target market, we misclassified 67 zip codes as being outside of the New Orleans MSA. We said they were non-metro zip codes. Okay. I realize that's an error. I'm not going to stand here and tell you that we didn't make errors. But the fact of the matter is, no determination was ever made as to what impact that would have. What's one of the other set of errors? The notion that members where you didn't have income information, you then assumed, counted in your favor. That's the second, and I'll just jump to it because I think that's significant, too. That seems to be more compelling. There are two things there. We've got one issue where they make a determination that we were looking at income numbers and chose to classify them as low-income numbers. And quite frankly, those two issues basically deal with, excuse me, I'm sorry. There are two issues there. One is that we looked at our third-party vendors' classifications and our own internal information, and we chose the lower of the two. And so therefore... That's another problem, but go ahead. The other problem is that when we were looking at those classifications, there were 30% of the market that we couldn't make a determination on on income. But in the record, and OIG knows this, and CDFI recognizes it, there's a test that's called the thin-line test, where when there are customers in the marketplace that don't have a lot of credit information, the CDFI has recognized this thin-line test that says, well, generally speaking, those people would be low-income because they haven't applied for credit. They haven't done anything. They're not in that mainstream marketplace where you're going to do that. Okay, so you're saying that theory of presuming low income in the absence of income information, that's something the agency's okay with? The agency, in memorandum... Yes or no? Yes. Let's switch to the other problem, which is when you have conflicting numbers, you assume always the lower number. How do you justify that? Well, there's really no evidence that we always assume the lower number. I will admit that we did assume the lower number, but this would be it. If Hart-Hanks came in and said that their income level was this based on public records, but we had information in our files that would show an income level lower, then we would use the lower level. That makes sense. We've got our own information that would allow us to process this. Now, I also want to point out that they're talking about the fact that we don't have these income numbers. I want you to think about this. I mentioned the 67 zip codes that are non-metro. Non-metro income in Louisiana... Mr. Buffington, you exceeded your time. You'll have five minutes on rebuttal. On rebuttal. You'll have five minutes. Thank you. Mr. Mansfield. I apologize. Good afternoon, Your Honor, and may it please the Court. My name is Peter Mansfield with the U.S. Attorney's Office. I am here on behalf of Defendant Apelli, United States Department of the Treasury CDFI Fund. The district court correctly resolved the two issues before the court this afternoon. Those are, first, the district court did not abuse its discretion in denying on path's motion to supplement the administrative record with declarations and expert reports created and produced over a year after this APA suit was filed, and on the merits of that APA claim. The district court correctly concluded that Treasury's repayment demand to on path had, and I quote, ample support in the administrative record. And that final agency action, again I quote, quite easily withstand scrutiny under the APA's deferential standard of review. And so for those reasons, the court should affirm. Does it matter that the application errors likely would not have made a difference in the ultimate decision whether to certify on path? Oh, they absolutely didn't make a difference, or else the repayment demand would not have issued. On path characterized the errors as immaterial administrative errors that had no bearing on the material question of eligibility. Thus, they would not have made a difference in the ultimate decision whether to certify as a CD. Mere argument, Your Honor, not supported by the record. What do we have here? A five-year OIG, Office of Inspector General audit. That was interactive. You posed the question, was on path treated fairly? I'll answer it categorically. Absolutely they were. Mr. Buffington was counsel for on path. He participated. He submitted letters to the agency that are in the administrative record. They retained an outside expert. You asked, did they have an opportunity to submit that into the administrative record? They did. That expert authored two reports that are contained in the administrative record. So the CDFI fund, when faced with these OIG findings through a lengthy five-year in-depth interactive audit, had conclusions that on path submitted invalid information in support of its original application in 2005 to be certified in the first place. They were not eligible for certification based on the information they submitted and they attested to in 2005. Under the Improper Payments Elimination Act, the agency was under a mandatory duty at that point to reclaim the money that they had granted to an ineligible recipient. I guess I need to know what it is about the decisions that were material if the people were already definitely poor enough to qualify. I mean, that's their argument. I need to know what it is where the agency said it is in fact material and this is unique. Because they argue that this is done throughout the industry, this is the common methodology that's used, and that it doesn't cause any problem for the bottom line. And that would be arbitrary and capricious if you went after them for something that doesn't material affect anything and that everybody else does it this exact same way and it was done with your agency's blessing and re-audited and certified many times throughout. If that were all true, this would be a real problematic case, don't you think? I would agree if that was true. But the administrative record, again, an APA case, all these arguments have to be grounded and founded and cited to materials and the administration. If you walk us through why these are not true. I will. So to become certified, you have to prove and establish through a methodology you certify to in your application that you direct 60% of your financial service products to a target market. A target market can be defined one of two ways. Through an investment area, which is a geographic tract that has already been determined by the Census Department to basically be low income. They don't reach a certain poverty level, and I think it's 80% of the median income. Investment area, option number one. OnPath did not apply in 2005 using the investment area criteria. They chose a different option. Low income targeted population that has a geographic component and, Judge Ho, you asked a question about income. It has an income component. So they can make representations about, we definitely serve low income. It's beyond question that we're serving a needy population. But the auditors, the OIG, they're historians. They look at what you certify to, and they ask the data that supports the representations you made. They found that severely lacking. I'm talking statistical discrepancies on the order of 1,000 to 2,000% for the non-metro areas. Are you saying that we shouldn't have gotten these services? I'm sorry? Or are you just saying the documentation wasn't in the file? The documentation that OnPath produced in the audit did not support the representations they made in the 2005. Right, but are you saying any people weren't actually poor and were scamming this system or something? All we can say based on this administrative record, Judge Elrod, is they should not have been certified in 2005 because they did not establish that they directed 60% of their financial service products to a target market according to the way they defined it in their application. Okay, what do you do with the fact that they say that, I'm just trying to walk through all the various hypos, that this was the established practice and norm in the industry? Do it this way. Statistical discrepancies on the order of 1,000 to 2,000% are not an industry norm. That cannot be justified. Manually downgrading, superseding, overriding income information to shoehorn, to pigeonhole people into a low-income category on the order of 30% to 35% of their account holders. There's no evidence in the administrative record that that's an industry standard. If I heard correctly, they're saying that, yes, on the one hand, they did systemically choose the lower number, but that's because the lower number was the more accurate number that they had internally as opposed to higher external numbers. What is your thought? The audit report said when faced with an MCIF, marketing consumer information file number, that might be one thing, in an internal number that said the other, they always chose the lower number. They didn't say the lower number always was the internal number. I read the audit report according to the administrative record. That's what they said today. That's what they said today, but again, where's the citation? You're saying they didn't always choose their internal data. They chose the lower data, whether it was the internal number or the external number. So it wasn't a principled approach. It was a lower number approach. Not only that, they didn't disclose in their certification application in 2005 that they did this. So there's an issue of non-disclosure transparency, and that is material. Can we go back to Judge O'Rourke's underlying substantive point, which is are we talking about just sort of a technical paperwork error that may or may not reflect duplicity, or are we talking about people getting loans from these people, from this institution, who should not have gotten them? We don't have enough information to answer the second question. So you're really focused on the first, that this is an institution that, according to the agency, committed deception. Whether or not it resulted in the wrong loans or not is a separate question. And again, this is not a False Claims Act case. We're not alleging fraud. But deception's not part of the inquiry. Well, all we can say is that the information they submitted in 2005 was not proven to be accurate using generally accepted audit principles that the OIG applied. How can you say it causes a material problem with the contract if you don't know the answer to the bottom-line question, did people get these that shouldn't have gotten it? Because we're answering a question about certification. And I think the down-the-line question with respect to where this federal money eventually goes to borrowers, it's just that, a down-the-line question. The first question is— Is your point that there is no—I'm sorry to interrupt, but— No, no. Just to deal with the materiality question, do you think that there is a materiality element here, or do you dispute that? They're relying on their actual assistance agreements for the materiality element. As I read the Improper Payments Elimination Act, it's not quite as explicit with respect to materiality. It says any payment that should not have been made, that was made in an incorrect amount under statutory, contractual, administrative, or other legally applicable requirements, and includes any payment to an ineligible recipient. So I think the agency, which is afforded a certain amount of, in an APA case, deference with its choice between various options, if they find that ONPATH was ineligible, they're under a duty under the statute to pull that money back. The materiality element would come if the agency found ONPATH to be in default under their assistance agreements. And you'll see in the OIG audit report one of the recommendations is review the assistance agreements agency and determine if ONPATH is in default. The agency elected another route, which is to say they should not have been certified, they should not have been eligible to receive any money in the first instance. So we don't even get to default. They were ineligible under the Improper Payments Act. All this money needs to come back. Does it matter to the analysis that you recertified ONPATH, not you personally, several times? There's no reliance interest? That they were very transparent in their filling out of the forms and trying to get the computer systems to work and they're on the phone all the time. This is not a secret in the back room. They're working with this group and the computer system's failing, so they're saying, how do we do this? And the agency kept recertifying them. And so at some point, don't they have a reliance interest that they're doing this okay if they're really transparent about what they're doing as they're doing it and they keep getting recertified? Because it's kind of a shock to get said, oh, no, all these many, many years, you have to repay that, and you've been going along thinking you're doing it okay. So two parts to that question. They were certified in 2006. The certification, I think, goes three years, and the original certification was extended. All we're talking about here is financial assistance that was awarded, I think, up to 2012. It's a $12 million amount. They sent in a new application in 2013, and they got kind of a new certification. Judge Elrod, I think that speaks to the agency's good faith. They take these applications at face value. They're not trying to play gotcha, but quite frankly, the options are kind of limited when you have an OIG report outlining statistical discrepancies up to 1,000, 2,000 percent, manually downgrading income levels, not disclosing that to the agency. That's a different ballgame altogether. So... What do you do with the argument about... So you think that they don't have any kind of reliance interest? Oh, and I wanted to speak to that as well. It's not a contract case. Look, detrimental reliance is a fairly narrow legal doctrine to begin with that's hardly ever available. No, but I mean as a matter of fairness in this process. I see. And that's generally what I've heard from ONPAT's counsel, that they're making an equitable argument. So could the agency have wiped the slate clean when they got the audit report and said, clearly you had some problems, let's start over, give us a new application, give us some new data, give us a new expert report to justify all of it, and let's see if we can find a way to get you to keep your money. Could the agency have done that? If you're posing that hypothetical, the answer is, yes, that was an option. But every agency adjudication, every agency rulemaking, involves an assessment of various options. But in order to vacate it under the APA and remand it for further consideration against that well-known statutory language, is it arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law? And here the agency had some options, but Judge Vance cited the right case law from the Supreme Court and from this court as well. We're talking about a narrow and deferential standard of review. The court does not review it de novo, either the district court or this court, de novo in the sense that this was summary judgment, but it's not making factual findings. It's assessing the adequacy of the existing administrative record, not the wisdom of the agency's choice. You don't usurp agency authority or exercise agency expertise. Has anybody else ever had to pay back this money after this same type of finding? Because they're saying that this is the common way that it's done in this industry. I don't have a clue because I don't . . . So do you know the answer? I'm not aware of any other case that would be . . . So they're saying that the whole reason that they're the only ones singled out for this type of thing that everybody does it this way, that that's arbitrary and capricious? No, not at all. The origin of the audit . . . And they complain a lot about, well, why was it that we were . . . Why are they the ones singled out for an audit? And did the audit just reveal that they were doing the same thing that everybody else in this industry does, but they were treated differently? There are no findings to that effect, that this was one in a million, that this is par for the course. No findings in the administrative . . . Can you give assurances that this isn't par for . . . I mean, that this is normal? I don't . . . I can't say that this is normal at all. What I can say is an audit report that reveals discrepancies statistically of this significant and substantial number and the manual overriding of load information . . . And let's not forget the thin credit file. Judge Howell, I think you asked a question about this. Basically, what that means is that the MCIF doesn't have income information. They assumed it's . . . Oh, because they hardly ever ask for credit, they must be low income. ONPAT's own MCIF vendor . . . This is in the administrative record . . . said that's an improper assumption. You can't assume low income status by a thin credit file. Maybe the super wealthy don't need to access credit because they have a lot of cash on hand, right? So, these improper assumptions for income are deeply troubling to the agency, to the OIG, and quite frankly, the district court as well. It seemed to me that she did rely on these problems to then find that this action did satisfy the APA deferential standard of review. I want to follow up . . . Sorry. I want to follow up what Judge Alroy was asking about earlier. I think she was asking, you know, were ONPAT's practices that are being challenged here, were they actually quite customary for the industry? I want to make sure I understood your answer. Is your answer that no, in fact, their practices were quite anomalous, which is why they were singled out, or you don't know whether it's anomalous or not? It's the latter. I don't personally know, number one, nor does the administrative record have any evidence that this was common or uncommon, but . . . You're saying the record is silent as to industry practice. That is correct, and I would like to point this out as well. It wasn't that ONPAT was singled out for an audit because the application was flagged as being questionable. The source of the audit, again, the administrative record is silent as to why the audit began, other than that a complaint was raised of some sort, from some source, and that once they got into the weeds, they started seeing some alarming problems with ONPAT's data or lack thereof. As far as you know, other participants in the program may do the same thing. They may not do the same thing, but your point is if they did the same thing, they, too, would be defunded. Absolutely. Absolutely. Look . . . Do you know how many people . . . Sorry to interrupt. Do you know how many others . . . What's the rate of these audits? Do they just draw the short straw and get this audit, or is everybody typically audited over a period of time? Again, no information to the number of audits in the administrative record, nor do I have any personally, just as an officer of the court. So it could be like the IRS, where it's very rare that you're randomly audited, or it could be like TSA, where I feel like every other time I go, I get . . . I would say most likely it's probably more rare than like IRS. This type of audit of a CDFI fund, and let's look at the amount of resources that went into this, Judge Ho. Five years, interactive, lots of interviews, site visits, reviewing a whole lot of records. I don't know how well-staffed Treasury's OIG office is, but I can't imagine they have too many of these going simultaneously, if that does . . . It's possible they were unlucky, but that doesn't make it . . . Doesn't make it right. Doesn't make it violative of the APA. But that's . . . look. The origin is not known. The record is silent as to that, and it may be a matter of, as you said, a lack of luck. But at the end of the day, what this court is charged with is final agency action, a repayment demand, and assessing that against the adequacy of an administrative record, again, to see if it conforms to minimal standards of rationality. Not ideal. Yes, Judge. It says here, there is no evidence that on path deviated from established practices and norms in the ACDFI industry. Is it your position that they would have needed to put on evidence that it didn't deviate from the norms and practices in the administrative process? I would say that that's an argument. They had an opportunity, and they participated in the OIG audit. They had an opportunity to respond to the audit report. They asked for reconsideration from the repayment demands, but they were never able to substantiate that commonality kind of argument with enough evidence to satisfy agency decision-makers. Okay. Their argument that they would have fully met the target market requirement based solely on qualified investment areas in Louisiana, I think that is basically, if you just look at the people who got this, you'd find that the whole thing was on the up-and-up, even if the data was wrong. The investment area methodology of satisfying your target market criteria is not the methodology they employed in 2005. I need to be very clear about that. It's a new, after-the-fact, post-hoc justification. Right. But if they used the new, better, modern methodology, all would be well, which shows that they didn't actually do anything wrong before, even though they have statistical discrepancies. They're trying to answer the question, did people actually get this that shouldn't have? That's the crux of their brief. Were we qualified? Could we have qualified under a different method, under a different criteria, using different loan data, using this expert that we're now presenting? The district court said, look, it's not the court's job, on an APA standard of review, to second-guess these alternatives, to hypothesize approaches that you elected not to take in 2005. They didn't have them back in 2005. No, no, the investment area methodology existed. They didn't use it. They say they had problems geocoding the addresses of their... But evidently, they got enough information, they have an expert doing it now. The question is, how many bites of the apple did they get here? I mean, where is the limiting principle here? If they try to justify it with new methodology, new data, new expert reports, do then we have to do a new audit? And remember, the OIG identified three problems with the application. The agency relied on one. You remanded back, did we take a fresh look at problems number two and three? So, again, potential Pandora's box if we start going down the path of post-hoc rationale. Most of these kind of cases have something where somebody actually did something wrong that caused a misuse of funds. And this doesn't... This is a severe penalty, and there doesn't actually seem to be evidence that there was a misuse of government funds. Mr. Mansfield, you're out of time, but ask the question, but you may just do it briefly. Very briefly. Agreed. The OIG did not find evidence of misuse of funds. It was purely a question of eligibility to receive the funds in the first place. To an eligible recipient, improper payments act is clear. You got to get the money back. Thank you, sir. Thank you.  Mr. Buffington, you have five minutes on the phone. Thank you, Your Honor. A couple of points. I think it's important to note that OIG changed the rules in the middle of the game. They were looking at misuse of funds. That was the report. And then all of a sudden, they get into this methodology issue. It never came up anywhere. But that's fine. That's a fundamental problem. But I want to go back to the income conversation we were having, because one of the points they make is we didn't make a determination of what those income levels were. Well, there's evidence in the administrative record from OMPAT to CDFI and OIG that clearly shows that we went in and did a statistical sampling of 25,000 borrowers to determine whether or not they met the income levels. And through that, we did 1,200 of 25,000. And if you look at what CDFI requires, CDFI would only require you to do about 400 samplings over 25,000 to come up with a 95% correction rate. So we did far beyond what CDFI wanted you to do. And that's really important. I do think it's important, and I want you to make that point. I think I've got to connect these dots again, because I know it's jumping all over the page, but this is what happened. OIG said we submitted invalid information and sent that determination to CDFI with instructions to determine whether or not the money had to be repaid under the grant agreements because of what they found. This is what CDFI said. Because of the audit report, we find that you're in the fault and ineligible to receive the funds, so pay them back. My hang-up on the material issue in the grant itself is connected with everything. And this is an easy case for OIG and CDFI. All I have to do is stand before you and say, oh, we did everything right. We gave them an opportunity. They didn't give us every opportunity. We did provide information. They rejected that information. The statistical sampling that the institution did, they rejected it. You don't find it anywhere in their OIG report or in the letter finding that we're in the fault. When we talk about moving around income levels and we want to get off on a 2,000% change in income levels, let me describe that to you. This is moving 67 zip codes from non-metro to metro. That's what their chart shows. That's the 2,000% change. I want you to think about this. When we're talking about income levels, the median income in the non-metro area was $32,000 at the time. The median income in the metro, New Orleans metro area, where those zip codes were being moved to, was $42,000. It only draws logic that you would then question whether or not the people that were moving from non-metro to metro were still low income and would still qualify the institution to be a CDFI. That kind of analysis was never done. All it was, oh, you made an error and we relied on it, and so this is it, and you didn't describe that methodology exactly what you're doing in your application, which, by the way, the term methodology is not required in the application. It's not even used in the application anywhere. So we've just got OIG coming in and making this determination, and I will say this. In the record itself, too, CDFI points out they have never had a case like this before. Never. That says enough for me. I don't know what OMPAT did to OIG or CDFI. I got into this case three years after the fact in 2018, and I will tell you this. When allegations or statements are made that we participated in the process and worked with them, we did try to work with them. We never envisioned that this would even be a reality. Neither did CDFI, and quite frankly, I don't think OIG ever thought it was either. I don't know where that changed, but somewhere in the process, they went from investigating fraud and misuse to investigating whether or not invalid information was produced and whether or not you were going to require, which we've already admitted. I think I heard two different things, that they do have an obligation to require the money to be repaid, but I think I also heard that they don't have an obligation to require that money to be repaid. So I'm not sure why OMPAT, as we stand here today, is being singled out. We think clearly under the existing case law, they have not met any standard for this decision to be held up, and if you'll look at the case law, every standard by which a decision is set aside by an agency, we have shown that we've applied that, and quite frankly, this decision should be set aside. Thank you, Mr. Buffington. That concludes our arguments for this afternoon. These cases will be taken under advisement, and this court panel will adjourn until 1 p.m. tomorrow. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.